R old this morning which is 20-8030 Vincent vs. Nelson. Welcome back Mr. Mead and for the appellant you go first is Mr. Ingram. You may proceed. Thank you very much Chief Judge Tempkovic. Todd Ingram on behalf of the appellant Vincent. I would like to reserve if possible three minutes of my time for rebuttal so when it turns yellow I'll try to be done. I've had quite still morning by two minutes so I've had quite an education over this morning. Good morning but if I dare say I believe this case and the issues in it and the questions to be answered will have the most far-reaching effect of any case of the six that we've discussed this morning. Those questions include whether a party can rely on pretrial disclosures and the confines of a pretrial order to develop trial strategy and presentation, includes whether the rules have teeth and should be enforced in order to preserve their intent or waived when lights come on by parties in mid-trial and parties have their experts do more work on critical questions of fact. This will affect every case if I dare say so where experts are designated which is pretty much every civil case out there these days. So my intent this morning, almost this afternoon, is to basically address the Smith versus Ford factors. I'd focus on the surprise prong, the prejudice prong and if I have any time on the bad faith and willfulness prong. Well before you jump to the Smith factors you first have to show that the testimony that was presented violates the disclosures, right? You don't automatically jump into the Smith factors. Well okay, I can accept that, Your Honor. And let me be more specific. The problem that I have is that these witnesses, you know, we have lay testimony and we have expert testimony. We don't have lay witnesses and expert witnesses per se. So you can have a single witness who's testifying as to factual knowledge that they don't have to be designated for and the same witness giving expert testimony. Correct? Yes, I mean I think that there's a distinction between lay testimony or lay opinion testimony versus expert opinion testimony. Some of what was asked here, I mean I guess I don't think there's anything wrong with asking Mr. Steele, look at this aerial map that was provided during discovery and tell me where you were when you were called out to the accident site. That sounds like just giving factual information based on personal knowledge. That doesn't sound like expert testimony to me. What am I missing? Okay, I would say, Your Honor, and there's some indications in the transcript that yeah, we weren't opposed to Steele and McGinty who went out after the trucks had been nuked and all that kind of thing to talk about where they went. I mean, again, bear in mind that the mine is more interested in getting back to profit-making activities than actually documenting anything, taking pictures. There's a no-picture policy, so we don't have pictures. But yeah, they went out there and they generally were around where this occurred. Did we have an objection to them saying, that's where I went or something? No. But, Your Honor, we're talking about an aerial photograph that was from three weeks before this incident. And from the very beginning of this trial, as part of the ambush basically, is that that to basically show where haul trucks were moving, which directions, back and forth. And the court said, with that caveat, I'll allow it. Now, there was testimony and the stipulation when that was coming in was that, no, this doesn't represent the way this mine looked three weeks later. Roads can move. Widths can change. There was nothing but speculation that this aerial photograph accurately depicted what was happening or where things were located  The jury was informed of that, wasn't it? I mean, the jury was informed of that, weren't they? I mean, the jury knew that this was three weeks, this picture was taken three weeks before. They knew that it would, that things changed and it would not necessarily represent the exact configuration of things at the time of the accident. So, if they knew all those things and Mr. McGinty would say, well, you know, I was generally around there. What's problematic about that? That's a fact statement which is filtered through all of the disclosures about the fact that things change. Thank you for the question, Judge Holmes. My point is that pointing to, for example, a dog leg on this aerial photograph and saying that's where I was involves, I mean, in my opinion, it involves, it is taken to a different level because the map changes. Because you have, it's not as if I gave someone a Rand McNally map that never changes and said pinpoint the street corner where you stood when this happened. Didn't your cross-examination, though, expose any changes in configuration or explain why this is not an accurate representation? No, Your Honor. The reason I answered that question that way is because over the course of the trial, the defense witnesses continually built upon what was the initial purpose for this aerial photograph to come in. It morphed from we're just showing directions and general layouts to no, this represents an accurate portrayal, a reasonably accurate portrayal of the way things were on that day in question. Did both drivers testify? Yes. And they could have explained where they were and what, you know, I'm not condoning necessarily an inaccurate exhibit, but to the extent there's inaccuracies, that's cross-examination, other witnesses, and your experts could point out. Your Honor, I think the point is that at no time prior to trial had there been any indication, disclosure or otherwise, that this general aerial photograph intended to mark which direction people were driving would be used in any way to pinpoint or suggest that it would accurately reflect the location of the crash. That's where we drew the line in terms of objecting. Not that you went out, but that you could use this map that was never represented to accurately represent what was happened on that day to pinpoint where you went. So that was where we... You had your own map, didn't you? You had your own map that was your theory of the case, where the location was? Well, Your Honor, there were investigation notes and rudimentary diagrams created by M. Shaw and things like that, but no, we didn't have our own map. Yeah, so that's the point is that going into this trial... Well, you had the same data, you had the same data as the defendant. Didn't you have the capacity to create your own depiction of the scene at the time with the same caveats as it relates to the potential for inaccuracy? No, Your Honor. And why is that the case? I mean, specifically, I know at one point we were talking on Mr. I don't know how the notion of the overlay that he did. Well, could you have done the same sort of overlay? No, sir. Why? Because this goes back to the way that the defense convinced Judge Johnson to let this in in the first place by suggesting to the court and arguing to the court that everything had been disclosed. We gave there's nothing new here. That was not true. The fact of the matter is that MindStar data that was provided to us did not come in a standard GPS format. It did not include longitude and latitude as in normal GPS. It came in some XYZ format that during the middle of trial, apparently, Mr. Opfer relied on the engineering department of the mine to put into some computer program and convert with proprietary information from XYZ coordinates to standard GPS coordinates. And you used the word proprietary information. Are you telling me then you could not have had an expert who could have replicated what Mr. Opfer did? I mean, could not? Is it possible if there would have been a disclosure about what program was used that we go on and found somebody that had a similar program and try to do it ourselves? But that was what was happening in the middle of trial. Well, why didn't you ask for a continuance? I mean, what I'm probing anyway is the question of prejudice. And one aspect of that is the continuance that counsel often seek in these situations. Why didn't you do that? Okay. Thank you, Judge Holmes. A continuance appeared eminently disruptive, not workable, and only calculated to enhance the prejudice that was happening in the court. When we received this information, it was considered, well, can we get our own expert here? Well, it was quickly apparent that if we were to move for a continuance, it would need to be a substantial continuance. That we'd have to get the discovery about what was provided, this data. We'd have to find out what the engineer did because Mr. Opfer didn't do this. He watched apparently some engineer do something and then came to court and said, I watched the engineer do this. So we'd have to depose Opfer, the engineer, find the proprietary system, engage our own expert. We're in the second week of trial. There's a jury waiting. We came into court the morning after that hearing where Opfer was on the stand and generally described what was going on. And the court said, you know, Mr. Mathieu, I'm going to sustain your objection. I'm going to keep out this exhibit that you prepared. But then right as the jury's coming in the door, he says in response to Mr. Worthen, yeah, he can go up and point to the map. So basically then over the course of the next hour, Mr. Opfer was allowed to do essentially what the exhibit that had been excluded because of its prejudicial impact would have shown. So, you know, when we're faced with that, the Smith versus Ford case and Progeny talk about that if a continuance is going to be disrupted, substantially disrupted, you don't have to make a request for it. That didn't happen in Smith. There's another First Circuit case, the Alberti-Velez case that I've mentioned, and I want to briefly mention, Your Honor. I'm almost out of time. But we went into this trial with the confines of our pretrial disclosures in mind. We formulated a trial strategy exclusively on that, and we're entitled to do that. It was based on the fact that there was no documentary proof about where this crash happened. It was based on witness testimony. And everything before location. And if it was in the narrows, she shouldn't have gone. She knew she shouldn't have gone for it. And her decision intentionally, not by distraction, to go for it was willful and one. And were McGinty and Seahill, they had been out to that area, general area prior to the accident, right? And yes, Your Honor. Go ahead, please. And in their investigation, they fired her. They fired Nelson because of this. All of the records that existed, the MSHAW investigation, the notes, nobody talked about dog legs. Nobody talked about wide spots. Well, the point I'm making is when they pointed to the map, why wouldn't they have said, well, you know, it was around there. What I do know, having been out there, is it was in the narrows. But they didn't say that, did they? No, they didn't, Your Honor. And that actually speaks to the last issue in our case, which is the financial interest of the mine, is that they changed their stories. They came to Ava Nelson's rescue, this former employee who had been fired. And they even offered up the services of their engineering department by all accounts that we can tell for free of this former employee. Why? Because our contention is that they had a So, you know, yes. Go ahead and sum up. I'm sorry. I've used it all. I had lots of other things to talk about, but I hope that I've answered your questions. We would request that the court reverse and remand for a new trial for the abuse of discretion associated with allowing undesignated testimony, the denial of our motion for a new trial, and for not allowing us to impeach the mine witnesses with the financial interest evidence. Thank you, Your Honor. All right. Thank you, counsel. Let's turn to Mr. Mead. If it please the court, Malcolm Mead of Holland Evans, Colorado Bar Number 11684, for Defendant Apolli Ava Nelson. When considering this case, it is important to keep three basic points in mind, points that may tend to get lost in the briefing and argument. First, the purpose of trial was not to determine the location of the accident or even if the accident happened in a narrow stretch of road. The purpose of trial was to determine if Ava Nelson engaged in willful and wanton misconduct. Nelson was traveling at only eight miles per hour. It was night. She thought she could pass plain as truck safely. She misjudged the distance. This might be negligence, but if the judge said we're denying the motion for a new trial, the jury could find that this was not willful and wanton misconduct, regardless of where the accident occurred. The second point to keep in mind is that plaintiff's truck was parked before the accident. Plaintiff was driving an empty haul truck down into the Four East Pit. The defendant was driving a loaded haul truck up out of the Four East Pit. By the rules of the road in the mine, defendant had the right of way. When plaintiff saw defendant's truck approaching, he pulled to the side and stopped. Undisputed, the plaintiff's truck was parked before the accident. The third point to keep in mind is that whether plaintiff's truck moved in the accident is disputed. Plaintiff says his truck was dragged backwards by defendant's truck some distance up the access road, but this point is disputed. Mike McGinty, the coal operations supervisor, arrived at the Four East Access Pit minutes after the accident. McGinty found the trucks as they stood before anyone moved them. He walked around both trucks, including the front of plaintiff's truck, with a flashlight looking for damage, looking at the tires, looking at the roadway near the tires, and bear in mind it's a gravel roadway. He saw no drag marks on the ground. If there were no drag marks on the ground, then plaintiff's truck did not move in the accident. From these observations, McGinty could say the accident happened right where plaintiff's truck was parked. And this statement, that the accident happened right where plaintiff's truck was parked, is admissible as the opinion of a lay witness because it is rationally based on McGinty's personal observations and derived from a common process of reasoning that requires no scientific analysis or specialized knowledge. McGinty arrived at the Four East Access Pit minutes after the accident. Again, he found the trucks as they stood before anyone had moved them. He walked around both trucks, including the front of plaintiff's truck, with a flashlight looking for damage, and saw no drag marks on the ground. Again, if there are no drag marks on the ground, then plaintiff's truck did not move in the accident. And if plaintiff's truck did not move in the accident, then the accident happened right where plaintiff's truck was parked. McGinty then turned to the aerial photograph and pointed to the general area where the accident happened. And this statement, using the aerial photograph to show the jury where the accident happened, is admissible as the opinion of a non-retained expert witness because it is consistent with McGinty's pre-trial disclosure and deposition. My concern is with regard to Mr. I don't know how to pronounce it, Ofer. Yeah, because, I mean, I have no problem with people who were called out there to look at a map that was produced during discovery pointing to it and saying this is where I was. But what Mr. Ofer did is a little different. He used knowledge based on what he observed people doing in the engineering department to use MindStar data to interface with the GPS system and come up with a different overlay where the trucks were at the time. That sounds to me like that's stepping over into expert testimony that wasn't disclosed. Partially correct, Your Honor. Yes, he's stepping over into expert area, but he was disclosed as an expert witness. Mr. Ofer was disclosed as both a lay witness and a non-retained expert witness. But there's nothing in his disclosure that says anything about that he's going to monkey around with the MindStar data and formulate an opinion based on the MindStar data on where the trucks were. Again, partially correct, Your Honor. The disclosure says that he will apply the MindStar data to the facts of the accident. One of the facts of the accident is the location. The MindStar data reveals location. Consistent with his photograph to show the location. Did the plaintiff have access to the MindStar data? Absolutely, Your Honor. When Ben and Ofer was deposed a year before trial, we divulged all of the MindStar data. All the data showing the location, speed, and movements of the trucks in 2013 when the accident happened. Did the plaintiffs have access to the tools necessary to apply the MindStar data? I mean, according to what we just heard, it doesn't operate under a normal GPS software system. And that's a good question, Your Honor. And that goes to an interesting issue in this case, which is, at what point does the duty to disclose end and the duty to ask questions begin? Before the deposition of Brandon Ofer, we gave Plaintiff's Counsel the aerial photograph of the accident in 2013, three weeks before the accident. They have the aerial photograph. Ben and Ofer is deposed about all things MindStar, and he said MindStar will reveal the location and movement of the trucks. Isn't the obvious question, if the exact location of the accident was critical at that time, wouldn't the obvious question be, is it possible to apply the MindStar data to the aerial photograph? The answer would have been yes. Next question is, how do you do it? Well, the answer is simple. The aerial flight system, called the OrthoFlight system, the MindStar data, and the computer-assisted design in the engineering department are all pre-loaded with the same format for GPS coordinates. So, all three display location using the same format for data. Therefore, the engineering department could simply plug in the MindStar data to the computer-assisted design machined in the engineering department, and the result would be a printout of location of the aerial photograph. Your Honor's question reminds me of a passage from the Smith decision, Smith v. Ford, where Judge William Doyle is speaking in his dissent, and he says, raises a question, is it unnecessary for the adversary party to take obvious steps to protect his position? Neither side should, consistent with the spirit of the rules, be allowed to sit back and fail to take obvious action to ascertain facts. To fail to do so suggests an attempt to use the rules for the object of developing an error. What he's getting at is the idea that at some point, disclosure ends and a duty to investigate next questions begins. Automatic disclosures did not do away with discovery. We still have discoveries. The legal system is still an adversary to systems. You still have to ask questions, and during the deposition of Bennett Ofer, the question is so obvious, just ask it. Can you apply the MindStar data to the aerial photograph? Answer yes. Next question, how do you do it? You run it through a CAD program, and you get the results. Not in every circumstance, talking about Ofer now, Ofer, in his testimony, not in every circumstance, as opposing counsel said, or is counsel required to seek a continuance when there is a perceived surprise that is presented to them? If they did not, what do you suggest they could have done to address this matter, but for continuance? Well, Your Honor, one thing that did happen, which is normally considered an alternative to continuance, is to depose the new witness or the existing witness about the new opinion during a break in trial, an evening in trial, and that happened here. On the Thursday at the end of the first week of trial, after the, when the daily session had ended, because it went into the late afternoon, early evening, we brought Bannon Ofer in, explained his new map photo exhibit and what he would testify about, and put him on the witness stand, not in front of the jury, but outside the presence of the jury, basically to plan if you take a second deposition of Bannon Ofer. This went on for about two hours. Plaintiff's counsel could ask every question conceivably that they wanted to ask. If there was prejudice or surprise, that cured it. If you don't want to seek a continuance, there's your alternative right there. Depose the witness in a break-in trial. I had a second point and I lost it. I apologize. The interesting thing about this case to me is that... Why don't you comment on the insurance point for me, please? Sure, sure. Plaintiff's theory is that a judgment against, well, the mine is insured, they knew this. If there's a judgment against the mine, the insurance company will, if there's a judgment against Ava Nelson, who's an additional insurer on the policy, the insurance company will pay most of it, but not the deductible. So if there's a large judgment against Ava Nelson, the mine will be unhooked for the deductible. And if the mine pays the deductible, this will affect the profitability of the mine for that year. The mine pays bonuses to employees every year. If the mine is not productive in this year, the year of the trial, then the mine would not pay its employees a full bonus or bonus at all. How much was the deductible? I don't believe that's ever disclosed, Your Honor. We can assume it's substantial, but not disclosed. The judge found that there are so many steps in there that it just becomes unwieldy and the prejudice outweighs the public value. And the particular step that was missing, the gap that was missing was that they never established that the bonus paid to an employee is key to the profitability of the mine as opposed to the performance of the employee. In many companies, a company pays bonuses based upon individual performance, not the company's performance. So there, I thought, okay, so that fact, the connection, the nexus between the bonuses and profitability of the mine, that's not established in the record? Correct. They deposed a representative of the mine about financial matters, including the insurance policy, including the bonus paid to employees, but they never asked the key question again, which is, is the bonus key to the profitability of the mine or the performance of the individual? Just a question that was never asked during discovery, and therefore nothing in the record on that point. It was less speculative. Regarding Brandon Ofer, I pronounce it Ofer, I assume that's correct, the puzzling thing to me with that is, if every truck at the mine has a GPS tracking device, which emits a signal every 60 seconds, and that signal contains information about location and And if the mine star system can track the location of every truck in almost real time, then why didn't anyone apply the mine star data to the aerial photograph long before trial to determine the precise point of impact? And the answer is simple. Long before trial, no one cared about the precise point of impact. Everyone knew the accident happened on the four east access road, and as far as location goes, that was all that mattered. I know the judge in his ruling on Brandon Ofer's exhibit said that location... And that's all that's mattered because of the high standard of liability that was at stake, I mean, or conduct that would establish liability of the defendant. In other words, we're focused on willful wanton conduct, and the precise location of the accident was not a significant factor in that determination. Is that what you're saying? Correct, your honor. Plaintiff's theory before trial was that Ava Nelson was speeding and a reckless driver. But when Discovery revealed that she was traveling at only eight miles per hour, that theory fell by the wayside. They then had a different theory, which is that, well, the four east access road is officially considered a narrow road, and it's designed for one-way traffic only. Therefore, one truck should not try to pass another truck on the road. And that theory was superficially appealing, but the problem with the theory is that the four east access road is not a straight, linear road. It's not one width all the way through. It has wide spots, wide spots where two trucks could pass safely. So as trial approached, they had to change their theory and focus on a precise point of impact. And that explained why they never bothered to prepare a map, because it wasn't their theory until the first week of trial, or close to trial. And I know the judge said the location was an issue. And from the judge's standpoint, that's understandable, because for the years leading up to trial, there have been many disputes about near misses and other accidents in the mine. They just wanted to show that the mine was having near misses and accidents on roads, but these were not the four east access road. Then they went and said, well, are they narrow roads? Well, yes and no. So there's a lot of discovery battles, pre-trial battles, about accidents and location and roads, but they were not battling over the precise location of this accident. And that's why they never asked the obvious question, which is, can you apply the mine star data to the aerial data? Your time's expired. Mr. Ingram, if you want, I'll give you 60 seconds for rebuttal, since we took a lot of your time. You're on mute. You're on mute, Mr. Ingram. Sorry, thank you. Three things. In closing argument, defense counsel said, arguably, the largest dispute that you guys have been asked to resolve is where this accident happened. Opfer, I think, conclusively resolved exactly what happened. The location of this crash has always been the central issue, that if it happened in the narrows, she should not have gone. No discretion. She went for it. Mr. Vincent's life was changed. The defense counsel's own words proved that this was a critical issue, always. Next, why didn't we ask the obvious question? The defense attorney said, the light just went on. The Smith case said, we reject the should have known argument. The rules of disclosure serve an important purpose. If you adopt this argument, we're turning those rules on their head. Then finally, your honor, the whole plaintiff's case, the strategy, was built on the fact that all we had was witness testimony. At the end of trial, they come in with this expert who places these pings. There's this air of scientific reliability that had never been disclosed before. If this had been disclosed, our entire trial strategy would have been different. We lost credibility with this jury when it appeared we were just going through the motions for the first week and ignoring or trying to evade this scientific approach to this question. Your honor, thank you. All right, counsel, appreciate that. Your excuse and your case will be submitted. The court will be in recess until tomorrow at nine o'clock. If I could ask the panel to hang on a little bit after counselor excuse. Thank you. Everyone's off, judge. Okay, it is 1231 Mountain. Can we reconvene at 1245 Mountain, 14 minutes? Is that okay? Yes. See you in a few minutes. Are you calling us? I am calling you. Okay, great. Thanks.